FILED
2006 Jul-18  AM 11:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

**JILL W. TROWBRIDGE,**

    **Plaintiff,**

        **v.**

**GLAXOSMITHKLINE PLC,**

    **Defendant.**

}
}
}
}
}
}
}
}
}
}

**Case No.: 2:04-CV-3530-VEH**

## OPINION

This Court has before it the May 12, 2006 motion of Defendant GlaxoSmithKline PLC ("Defendant") for summary judgment as to Plaintiff Trowbridge's claim (Doc. 9).    For the reasons set forth below, the Defendant's motion for summary judgment is due to be granted as to Plaintiff's retaliation claim under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, <u>et</u> <u>seq</u>.

## I.  Procedural History

Plaintiff Trowbridge commenced this action on December 28, 2004 by filing a complaint in this Court alleging violations of Title VII of the Civil Rights Act of

1

1964, as amended, 42 U.S.C. § 2000e et seq.

Plaintiff Trowbridge alleges in her complaint that she was subjected to retaliation in violation of Title VII by the Defendant in compensation, promotion, and other terms and conditions of her employment for making complaints of discrimination. Plaintiff Trowbridge alleges that she was retaliated against by the Defendant and subjected to two adverse employment actions: (1) a three-month delay in moving her to full-time employment and (2) her assignment to the Birmingham North territory rather than to Birmingham Central.[1]

On May 12, 2006, the Defendant filed a motion for summary judgment asserting: (1) that Plaintiff Trowbridge cannot establish a prima facie case of retaliation because she cannot prove that she was subjected to a cognizable adverse employment action; (2) that she cannot show any causal connection between her complaint of discrimination and the employment decisions about which she complains; and (3) that Plaintiff Trowbridge cannot dispute the Defendant's legitimate, non-retaliatory reasons for its employment decisions and show that the reasons are a pretext for discrimination.

---

[1] Plaintiff Trowbridge concedes that the oral warning given by Maitrejean regarding prescription pads and her removal from the position of Imitrex product champion which were alleged in her complaint do not rise to the level of an adverse employment action.

2

The Defendant has submitted evidence[2] in support of its motion for summary judgment and filed a supporting brief on May 12, 2006.  On May 30, 2006, the Plaintiff filed a brief in opposition to the Defendant's motion for summary judgment.  The Defendant filed a reply brief on June 6, 2006.

## II.  Standard of Review

### A.  Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions,

---

[2] The Defendant submitted the depositions of Plaintiff Jill Trowbridge with attached exhibits and Eugene Maitrejean with attached exhibits . The Defendant also submitted the declarations of Kevin Floyd, Chris Webb, and Eugene Maitrejean.

answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  Fitzpatrick, 2 F.3d at 1115.  Once the

4

moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. Fitzpatrick, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come

5

forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

### III.  Relevant Facts[3]

Jill Trowbridge began working as a sales representative in the Birmingham East territory in February of 1997.  (Trowbridge Depo., at 25-27, Ex. 3).  In July of 2002, Trowbridge began a job-share arrangement with Rebecca McPherson, with each employee working three days a week.  (<u>Id</u>., at 64, 69).  Trowbridge reported to Senior District Sales Manager Eugene Maitrejean from the Summer of 2002 (when her job-share became effective) until December 1, 2003.  (Trowbridge Depo., at 7, 29, 66).

In 2003, there was much turnover in the Regional Vice President ("RVP") position directly above Maitrejean; the position was initially held by Anne Whitaker (January to June); then Brian Washburn (three weeks in July); then Chris Webb (July through November 30); and finally Jack Planchard (December 1 to

---

[3] Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the facts are presented in the light most favorable to the Plaintiff.  Facts are undisputed unless otherwise expressly noted.

present).  (Maitrejean Depo., at 132-33).  Washburn and Webb served only as acting RVPs and did not make any substantive employment moves during their tenures. (Maitrejean Depo., at 137) (Trowbridge Depo., at 62, 282) (Webb Decl., ¶ 1).

On or about August 4, 2003, Trowbridge contacted GSK Human Resources Manager Karen Cutler and asked to speak with her. Karen Cutler then spoke with Trowbridge as part of an investigation into the complaints made against Maitrejean by David Cooke and Rebecca McPherson.  (Trowbridge Depo., at 196-197, Ex. 7). During her interview, most of Trowbridge's complaints related to Maitrejean's interaction with Cooke and McPherson.  (Trowbridge Depo., Ex. 7).  Trowbridge complained that Maitrejean would discuss McPherson's poor performance with her.  (Trowbridge Depo., at 99,11, Ex. 7).   Trowbridge did not claim that Maitrejean had made any sexual advances or sexually inappropriate comments to her.  (Trowbridge Depo., Ex. 7).  Maitrejean allegedly told Trowbridge that he needed to hire a diversity candidate and "if you see a nigger midget with a broken leg, let me know." (Trowbridge Depo., at 197-198).  Maitrejean denies making any of the inappropriate comments attributed to him by Trowbridge.  (Maitrejean Depo., at 25-26, 70-72,77:15-78, 80-81).  Cutler confirmed with Trowbridge that retaliation would not be tolerated by GSK.   (Trowbridge Depo., at 210).

Maitrejean was placed on administrative leave during the investigation, and Maitrejean was instructed to limit his contact with Cooke, McPherson, and Trowbridge.  (Maitrejean Depo., at 99)(Trowbridge Depo., at 109-110).

Maitrejean's interaction with Trowbridge thereafter was "strictly business contact," and Trowbridge admits that he has not engaged in any inappropriate language after August 2003. (Trowbridge Depo., at 121-122).  In mid-August of 2003, Maitrejean traveled to North Carolina to interview with Cutler and respond to the charges made against him. (Maitrejean Depo., at 70; 89).  On August 25, 2003, Maitrejean received an Incident for Policy Violation Memorandum in which he was advised that Human Resources had determined that he: (1) made disparaging remarks and discussed performance concerns about members of his team with other members;  (2) used profanity in meetings and during field contact rides; (3) created a negative work environment by being overly directive and emphasizing negative feedback; (4) played golf with a physician on a work day; and (5) spent an excessive amount of time on his cell phone during field contact rides.  (Maitrejean Depo., at 87-88, Ex. 3).  Maitrejean does not dispute that he made disparaging remarks about team members, that he used some minor profanities on occasion, and that he had played golf with a doctor when he should not have, but disputes the other findings of the investigation. (Maitrejean Depo.,

at 70-72; 75 -78, 86; 90-91) (Maitrejean Decl., ¶ 2, Ex. 1).  Maitrejean was advised that this letter of reprimand would remain in his personnel file for one year and that any future violation by Maitrejean could lead to the possibility of termination. (Maitrejean Decl., ¶ 2, Ex. 1).  Maitrejean was specifically warned not to retaliate against any of the persons who brought complaints against him. (Id.).  Maitrejean attended a sensitivity training course in November of 2003 at the suggestion of Karen Cutler.  (Maitrejean Decl., ¶ 2).

### Verbal Counseling

GSK and other pharmaceutical sales companies created the Pharmaceutical Research and Manufacturers Association ("Pharma") Guidelines in July 2002 to provide industry standards for sales representatives.  (Maitrejean Depo., at 55 - 56:4) (Trowbridge Depo., at 221-222).  In September of 2003, Trowbridge violated the Pharma guidelines and GSK policy by not using the proper method for ordering preprinted prescription pads for one of her assigned doctors. (Trowbridge Depo., at 220-223; 234, Ex. 8)(Maitrejean Depo., at 129).  Trowbridge admits that she violated company policy and the Pharma guidelines.  (Trowbridge Depo., at 220-223).  Maitrejean merely orally counseled Trowbridge regarding this incident, which is not considered discipline under GSK policy.  (Trowbridge Depo., at 122-123, 224-225, 234)(Maitrejean Depo., at 57, 135).

## Delay in the Move to Full Time

In June of 2003, Trowbridge and Maitrejean began discussing the possibility of Trowbridge's moving to a full-time position. (Maitrejean Depo., at 16)(Trowbridge Depo., at 75-76). A move to full time would have to be approved by: (1) the RVP, (2) Vice President Lisa Gonzales, and (3) Human Resources. (Trowbridge Depo., at 82-83)(Maitrejean Depo., at 17, 20-21). Maitrejean's recommendation was also required for Trowbridge's move to full-time. (Maitrejean Depo. 17). Maitrejean was in support of Trowbridge's moving to a full time position, and considered Trowbridge to be a leader in the territory. (Trowbridge Depo., at 82)(Maitrejean Depo., at 22-23).

Trowbridge was placed in a full-time position effective December 1, 2003, but Trowbridge contends she was retaliated against by not being placed in the full-time position sooner. (Trowbridge Depo., at 143-144, 233-234). Trowbridge testified that Maitrejean had hand-picked another GSK employee, Mark Shepherd, to be placed in a position three weeks before she asked Maitrejean about her selection, which was during this period of regional vice president turnover. (Trowbridge Depo., 139, 143). The Defendant asserts that the delay resulted because there were four different RVPs assigned to the territory over a six-month period, which created difficulty in getting the necessary approval. (Maitrejean

Depo., at 29, 100).

The Plaintiff alleges that Ann Whitaker, regional vice president, gave her approval of Trowbridge's move to full-time work, which could be affected not at the end of a business quarter as previously thought, but instead at the end of any given pay period, i.e., immediately. (Trowbridge Depo., 84, 91). The Defendant asserts that Maitrejean approached Regional Vice President Anne Whitaker about moving Trowbridge to full-time in June but Whitaker never followed through on the proposal before leaving the position at the end of June. (Trowbridge Depo., at 83)(Maitrejean Depo., at 26-27). Trowbridge says that she had a conversation with Maitrejean when Whitaker was the RVP in which Maitrejean said "there's a lot of changes going on in the company right now and basically you're at the bottom of the priority list. You know, we'll get to it when we get to it basically." (Trowbridge Depo., at 219:5-220:19).

Brian Washburn began serving as Acting Regional Vice President at the end of June. (Maitrejean Depo., at 27-28). Trowbridge did not make up her mind that she definitely wanted to go full-time until the first week of July. (Trowbridge Depo., at 92-94). Maitrejean sent Washburn a memorandum dated July 21, 2003, proposing the move to full-time, with a start date of September 1, 2003. (Maitrejean Depo., at 28-29, 41-42:, Ex. 1). Washburn never approved the

11

proposal; he left the acting RVP position within the week after Maitrejean sent his memorandum. (Id., at 44-45, 100).  Maitrejean next submitted his proposal to Acting RVP Chris Webb, who began serving in the position in August of 2003. (Maitrejean Depo., at 100)(Trowbridge Depo., at 107, Ex 5).  Maitrejean submitted his proposal to Webb via e-mail on August 24, 2003, only two and one half weeks after Trowbridge had complained to Human Resources.  (Maitrejean Depo., at 59-60; 62) (Trowbridge Depo.,  Ex. 5).

Given that Webb was only serving in an acting role, he deferred the decision to Jack Planchard, who was to move into the position on a permanent basis effective December 1, 2003.  (Maitejean Depo., at 29; 139-140)(Webb Decl., ¶¶ 2-3).  No substantive employee moves were made by Webb or Washburn during the time they served as Acting RVPs.  (Maitrejean Depo., at 137)(Trowbridge Depo., at 282)(Webb Decl., ¶ 2).  There was a company-wide reorganization scheduled to go into effect on December 1, 2003; the restructuring effort involved newly designed geographic regions and reassignment of sales representatives among territories.  (Trowbridge Depo., at 63-64).  Given that Webb was serving only in an acting role and that there was a company-wide restructuring effort taking place, it was decided that Trowbridge's move and all other substantive moves in the territory should take place to coincide with the December 1 restructuring.  (Webb

Decl., ¶ 2).  All restructured positions were targeted to go into effect on December 1, 2003, when the company-wide restructuring was to take effect.  (Maitrejean Depo., at 123; 137-138) (Webb Decl., ¶ 2).

Plaintiff alleges that Maitrejean assured her that she could return to work full-time on September 1, 2003.  (Trowbridge Depo., 106)  However, she did not return to work full-time until December 1, 2003, a lapse of three months. (Trowbridge Depo., 144).

**Plaintiff's Territory Assignment in December of 2003**

Prior to the December 1, 2003 restructuring, there were two territories in Birmingham: Birmingham South and Birmingham East; Trowbridge worked in the Birmingham East territory.  (Maitrejean Depo., at 58 -59).  After the December 1, 2003 reorganization there were three territories: (1) Birmingham North; (2) Birmingham Central; and (3) Birmingham South.  (Trowbridge Depo., at 112-113). Every sales representative in the territory had some form of modification to their sales territory as part of the restructuring.  (Id., at 115-116).  Trowbridge preferred a territory assignment that would allow her to  maintain as many of her current customers as possible; she acknowledges that was the preference of every representative.   (Trowbridge Depo., at 117).   Decisions regarding sales representative assignments in the restructured territories were made jointly by

Chris Webb and Jack Planchard.  (Maitrejean Depo., at 65)(Webb Decl., ¶ 4-5).

Webb knew the sales representatives in the territory very well because he had been a market development manager for the Birmingham territories for several years. (Maitrejean Depo., at 109).   Webb and Planchard were aware when assignments were made that Trowbridge and Cooke were engaged in an intimate relationship. (Webb Decl., ¶ 4).  Webb and Planchard decided to place Trowbridge in the Birmingham North territory and to place Cooke in the Birmingham South territory so that they would not continue working in the same district.  (Webb Decl., ¶ 4).  They hoped that, by placing Cooke and Trowbridge in separate districts, they would reduce their interaction and the possibility of workplace disruptions caused by their relationship.  (Webb Decl., ¶ 4).  The territory assignments were announced to the sales representatives in September of 2003. (Id., at 135:12-20) (Trowbridge Depo., at 112).

Trowbridge was assigned to Birmingham North as part of the reorganization and reported to Kevin Floyd; the Birmingham Central and South territories reported to Maitrejean.  (Trowbridge Depo., at 31; 113-114; 243-244).  In October of 2003, after territory assignments were announced, Trowbridge requested to be placed in a sales representative position in the Birmingham Central territory. (Trowbridge Depo., at 127-128; 131-134; 143) (Maitrejean Depo., at 135-136).

She belatedly requested the position that was already assigned to Mark Shepard.[4] (Trowbridge Depo., at 143-144; 234) (Maitrejean Depo., at 136-137).

Shepard had been working in the Gadsden territory and had been assigned to the Central Territory to place him closer to his home in Birmingham. (Webb Decl., ¶ 5)(Trowbridge Depo., at 128-129). Planchard advised that his decisions were final and that everybody needed to accept their assignments and embrace change. (Trowbridge Depo., at 142 -143). Trowbridge acknowledges that the position in the Central territory would have reported to Maitrejean, her supposed harasser. (Id., at 126 -128). Karen Cutler had previously told Trowbridge that efforts would be made so that she would not have to report to Maitrejean after the restructuring in December 2003. (Trowbridge Depo., at 135 -136).

Trowbridge made more bonus money than either of her two comparators (Jennifer Chandler –  who served in the same position but in the Central territory – and Mark Shepard) in both 2004 and 2005. (Maitrejean Decl., ¶ 3, Ex. 2).  Other than calling on different doctors, the job duties for sales representatives in different

---

[4] Plaintiff alleges that Maitrejean represented to Trowbridge that he would speak to his supervisor, Jack Planchard, about placing Plaintiff in the Birmingham Central territory. (Trowbridge Depo. 138-139). However, Maitrejean noted that it was not fair for him to "hand pick" one salesperson and place them wherever they wanted. Id. Plaintiff asserts that Maitrejean hand picked Shepard and placed him in the Birmingham Central territory. (Trowbridge Depo. 128).

territories are identical.  (Trowbridge Depo., at 129-130; 243-244).

### The Imitrex Champion Assignment

A product Champion (such as the Imitrex Champion) is an informal assignment in which district sales managers ask representatives to make presentations about one of the company's drugs to their fellow sales representatives at district meetings.  (Trowbridge Depo., at 47) (Maitrejean Depo., at 45-46). There is no extra pay, promotion, additional job title, or bonus incentive that is provided because of the Champion assignment.   (Trowbridge Depo., at 47; 264)(Maitrejean Depo., at 45-49; 52-53).

District Managers often rotate the assignments among their representatives on a periodic basis. (Floyd Decl., ¶ 4) (Trowbridge Depo., at 44; 49).  Trowbridge contends that her District Sales Manager, Kevin Floyd, retaliated against her by removing her from the Imitrex Champion assignment after the present lawsuit was filed.  (Trowbridge Depo., at 44-46).

### IV.  Applicable Substantive Law and Analysis

Plaintiff Trowbridge alleges in her complaint that she was subjected to retaliation in violation of Title VII by the Defendant in compensation, promotion, and other terms and conditions of her employment for making complaints of discrimination.  Plaintiff Trowbridge alleged in her complaint four incidents that

she says constitute retaliatory actions:  (1) an oral conversation regarding her admitted violation of company policy; (2) the three-month delay in her move to a full-time position; (3) the denial of her belated request to be placed in the Central territory; and (4) the removal of the Imitrex Champion assignment.  Plaintiff Trowbridge concedes in her brief in opposition to the Defendant's motion for summary judgment that neither the oral warning given by Maitrejean regarding prescription pads nor her removal from the position of Imitrex  product champion rises to the level of an adverse employment action.   Therefore, Plaintiff Trowbridge's retaliation claim is based on two alleged adverse employment actions: (1) a three-month delay in the Defendant's moving her to full-time employment, and (2) her assignment to the Birmingham North territory rather than to Birmingham Central.

To establish a prima facie case of retaliation, a plaintiff must show:  (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression.  See, e.g., Weaver v. Casa Gallardo, 922 F.2d 1515, 1524 (11th Cir. 1991); Embry v. Callahan Eye Foundation Hospital, 147 Fed. Appx. 819, 830 (11th Cir. 2005); Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999)(citing Little v. United Techs., 103 F.3d 956, 959 (11th Cir. 1997)).

After the plaintiff proves a prima facie case, the defendant need only produce evidence that there is a legitimate, non-retaliatory reason for the challenged employment action. See McDonnell Dougvlas Corp.v.Green, 411 U.S. 792, 802 (1973). The presumption of retaliation is then rebutted and the employer is entitled to summary judgement unless the plaintiff proffers evidence sufficient to create a genuine issue of material fact that retaliation was actually the reason for the challenged action. Cf. Chapman v. AI Transport, 229 F.3d 1012, 1024-25 (11th Cir. 2000)(*en banc*).

The parties concede that Plaintiff Trowbridge engaged in statutorily protected activity: first, by complaining to the Defendant's human resources in August 2003 regarding racially offensive language of her supervisor; second, by filing an EEOC charge of discrimination on March 8, 2004; and third, by filing suit in this Court on December 28, 2004.

The Defendant asserts that the employment actions Plaintiff Trowbridge alleges she was subjected to, a three-month delay in the Defendant's moving her to full-time employment and her assignment to the Birmingham North territory rather than to Birmingham Central, do not constitute adverse employment actions. In Davis v. Town of Lake Park, 245 F.3d 1232,1239 (11th Cir. 2001), the Eleventh Circuit established a standard for determining whether an employment action is

18

adverse.  The Court held that to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment.  Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.  Id.

The Supreme Court in Burlington Northern & Santa Fe Railway Co., v. White, - - - S.Ct. - - - , 2006 WL 1698953 (2006),  found that the anti-retaliation provision of Section 704(a) of Title VII, unlike the anti-discrimination substantive provision of Section 703(a) of Title VII, is not limited to discriminatory actions that affect the terms and conditions of employment.  The Supreme Court held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context [material] means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Id. at 10.  The Supreme Court further reasoned that by focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, the standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining about or assisting in complaints about discrimination.  Id. at 11.

Plaintiff Trowbridge asserts that the three month delay in returning her to a full-time position from part-time resulted in her not receiving both full-time pay and a full-time bonus.  The Defendant asserts that the delay resulted because there were four different RVPs assigned to the territory over a six-month period, which created difficulty in getting the necessary approval. (Maitrejean Depo., at 29, 100).

The Plaintiff alleges that Ann Whitaker, regional vice president, gave her approval of Trowbridge's move to full-time work, which could be affected not at the end of a business quarter as previously thought, but instead at the end of any given pay period, i.e., immediately.  (Trowbridge Depo., 84, 91).  The Defendant asserts that Maitrejean approached Regional Vice President Anne Whitaker about moving Trowbridge to full-time in June but Whitaker never followed through on the proposal before leaving the position at the end of June. (Trowbridge Depo., at 83)(Maitrejean Depo., at 26-27).  Upon review of the record, the Court finds that there is a genuine issue of material fact as to whether Plaintiff was subjected to an adverse action when there was a three-month delay in promoting her to full-time employment from part-time.

Plaintiff asserts that she was also subjected to an adverse action when the Defendant assigned Plaintiff to the Birmingham North territory rather than to Birmingham Central territory.  Plaintiff Trowbridge asserts that the transfer resulted in her servicing different doctors, developing new relationships, and more

20

travel.  She also presented evidence that she lost all of her psychiatrists who were great economic clients, lost most of her business relationships, and lost prestige by giving up the Birmingham Central territory for the Birmingham North territory.  The Defendant asserts that it is undisputed that:  (1) there is no difference in pay between the two positions; (2) Trowbridge made a larger bonus than her comparators in the years following the restructuring; and (3) the job responsibility for the positions are identical except for the specific doctors upon whom the sales representatives call.  (Trowbridge Depo., at 129:9-130:6; 243:17-245:10) (Maitrejean Decl., ¶ 3, Ex. 2).  Upon review of the record, the Court finds that there is a genuine issue of material fact as to whether the Plaintiff was subjected to an adverse action when she was transferred from servicing the Birmingham Central territory to the Birmingham North territory.

Although there are genuine issues of material fact as to whether Plaintiff Trowbridge suffered an adverse employment action, Plaintiff must  prove a prima facie case of retaliation.  Even assuming, however, that Plaintiff Trowbridge has successfully shown that she was subjected to an adverse employment action, Plaintiff must demonstrate that the adverse employment action was causally related to the protected expression.

The causal link element of a prima facie case of retaliation is construed broadly so that a plaintiff must merely prove that the protected activity and the

negative employment action are not completely unrelated.  Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001).  Plaintiff Trowbridge alleges that she contacted human resources regarding Maitrejean on or about August 4, 2003. Maitrejean was given a serious written reprimand on August 25, 2003 regarding complaints alleged by Plaintiff and other co-workers.  Plaintiff asserts that Maitrejean began to give her the proverbial run-around concerning her return to full-time employment around September 1, 2003.  There is a dispute as to whether Maitrejean was aware that Plaintiff Trowbridge made complaints to the human resources.  Further, the Defendant asserts that the actions about which Trowbridge complains were taken by persons other than Maitrejean.  Plaintiff asserts that Maitrejean was a decision-maker because district managers such as Maitrejean have significant discretion in the reformation of territories and play a vital role in the timing of transfers.  Upon review of the record, the Court finds that there are genuine issues of material fact as to whether the adverse employment actions were causally related to the protected expression.

The Defendant asserts that even if Plaintiff Trowbridge can satisfy a prima facie case of retaliation, she cannot rebut the Defendant's legitimate and non-retaliatory business decisions.  The Defendant asserts that Trowbridge also cannot dispute that she was assigned to the Birmingham North territory in an effort to reduce any business disruption caused by her intimate relationship with David

Cooke.  An employer does not violate the anti-discrimination laws when it seeks to separate two employees who are engaged in any type of relationship that might cause disruption in the workplace.  See e.g., Thomas v. Runyon, 108 F.3d 957, 959 (8th Cir. 1997) (postal service legitimately separated two employees where there was potential for a "disruptive personality conflict"); King v. MCI Telecomm Corp., 1997 U.S. Dist. LEXIS 3090, *22 (N.D. Ill. March 17, 1997) (employer may legitimately separate employees involved in consensual sexual relationship).

The Defendant asserts that it is undisputed that Plaintiff never made a specific request for a particular position until after the territory assignments had already been made.  (Trowbridge Depo., at 127-128; 134-135; 143-144).  GSK cannot be said to have retaliated against Trowbridge when she never made her interest in a particular position known until after the decisions were already made. See Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133 (11th Cir. 1984) (under normal prima facie case showing, plaintiff must show that she applied for a specific position to eliminate the "obvious reason . . . that the plaintiff was not offered the job because the company did not know he was interested.").  Further, the Defendant asserts that it did not place Plaintiff in the Birmingham Central territory because Cooke, a co-worker she was having an intimate relationship, was in the Birmingham Central territory.

The Defendant asserts that Plaintiff failed to show that the delay in her move

23

to full-time was anything more than "normal administrative delay" caused by extreme turnover in the  Regional Vice President position and the fact that the company was focusing on a company-wide restructuring effort.  Evans v. City of New York, 2003 U.S. Dist. LEXIS 18281, *32 (S.D.N.Y. October 9, 2003). ("Plaintiff fails to provide any evidence that the delay occurred because of anything other than the normal administrative delay involved in this type of action.  Plaintiff suggests in his deposition that '3 or 4 other people got raises earlier,' however he neither names these individuals nor provides the circumstances of their raises. Consequently, the Court finds that the plaintiff has failed to present evidence that the delay involved in his raise was discriminatory or retaliatory, and the Court dismisses the claim.")  Plaintiff was treated no differently than any other sales representatives in the territory.   All moves were slated to coincide with the December 1st  restructuring.

Once the Defendant proffers a legitimate and non-retaliatory reason for its challenged action, the Plaintiff must proffer evidence sufficient to create a genuine issue of material fact that retaliation was actually the reason for the challenged action.  Upon review of the record, the Court finds that the Plaintiff has not presented sufficient evidence to demonstrate that the Defendant's legitimate and non-retaliatory reasons are a pretext for retaliation. Accordingly, the Defendant's motion for summary judgment as to Plaintiff's retaliation claim is granted.

## V. Conclusion

For the reasons set forth above, the Defendant's motion for summary judgment as to Plaintiff's retaliation claim is due to be granted.

**DONE** and **ORDERED** this 18th day of July, 2006.

_____

**VIRGINIA EMERSON HOPKINS**
**United States District Judge**